This month, we have four cases to hear this morning. We'll see how the breakdown goes, but I expect after two we may take a brief recess. First case in the morning is with Purpose, Inc. et al. v. Scott Seidel et al., cause number 2510573, Mr. Levinger. Thank you, Your Honor. May it please the Court. Jeff Levinger, representing WPI, the debtor. When Congress enacted Section 706A of the Bankruptcy Code, it gave debtors a near-absolute right to convert a case from Chapter 7 to Chapter 11 at any time. But the Bankruptcy Court here, in essence, turned that right on its head by giving itself a near-absolute right to deny a motion to convert. The problem, I think, began on page 19 of the Court's opinion where it said that the permissive language used in Section 706 gives a Bankruptcy Court discretion to grant or deny a motion to convert. That language actually comes from Section 706B, but this case is governed by Section 706A, which gives the discretion to the debtor, and not to the Bankruptcy Court. And the Court, I think, departed even further from the statutory language by basing its ruling on certain equitable considerations that both misapplied the law and disregarded the undisputed facts. And if I could, I'd like to begin with the undisputed facts. There are three of them in particular. First of all, WPI qualified as a debtor under Chapter 11, thereby satisfying the standard, at least one of the standards for conversion. And the trustee, in fact, admitted that, that the debtor qualified as Chapter 11 debtor. Second, the motion to convert was not like any other we see in the case law. This one had a restructuring support agreement that was signed off on by all the secured creditors. Counsel, you mentioned the case law. What case, aside from the Marama case, what case best supports your position on this issue? Your Honor, I would say probably Siegel, in the sense that Siegel, to be sure, is not a conversion case. But it does indicate that a Bankruptcy Court cannot use its powers under Section 105 to disregard what the code says and to disregard rights given to a debtor. Well, Counsel, that was just one part of the Maramore analysis. And it seemed to me Siegel said it was dicta. Correct me if I think that part is there. The rest of Maramore seems like it still stands, does it not? And we look at, among other things, whether after conversion the debtor has the right to use that particular chapter. To the extent Marama is based on statutory language, yes, I believe it still is good law. But it's limited. For one thing, it involves a conversion from Chapter 7 to Chapter 13. We're dealing with a conversion from 7 to 11. But Chapter 11 has its own limitations on what can be a Chapter 11 case, correct? It suggests that if a debtor engages in bad faith, and bad faith in the sense that it in the context of Marama involved pre-petition and post-petition misstatements and nondisclosures relating to its assets in a way that harmed creditors, if you have that situation, what that means under Marama is that under Section 706D, the debtor doesn't qualify. And immediate conversion would be permissible under, in that case, 1307C back to Chapter 7. So it basically involves the possibility but the risk of immediate reconversion as a result of bad faith, none of which we have here. With respect to the immediate conversion or the potential for that, what evidence do you have to show that the estate had sufficient resources to actually fund a Chapter 11 case? We talk about that on page 54, Your Honor, of our brief, where we give record sites to the availability. For one thing, we had a $2 million debtor in possession financing commitment at 0% interest. We had a commitment from, the testimony showed, from Mr. Neigebauer, who was the secured creditor, the unsecured creditor, and a shareholder of the debtor, to fund the money necessary to proceed with consummation. And we had a commitment in addition from the collateral agent. In addition, there was testimony that litigation funding would be available. So I think the court was basically speculating when the court said that reconversion would be necessary. In addition, I would point out that the chief restructuring officer, who was former bankruptcy judge Lee Clark, would deal with any asserted conflicts of interest that the court appeared to be concerned about. The conflict of interest allegedly involved Mr. Neigebauer, but he was fully aligned with the secured creditors, the unsecured creditors, and the shareholders being a member of each one of those constituencies. So I would submit that the court factually had no basis for saying that there would be immediate risk of reconversion because the concerns were entirely speculative and hypothetical. Moreover, under the law, particularly in the context of a 711 conversion, there's no legal basis for saying there would be an immediate reconversion. For one thing, under 1112b1, the court would have to consider the appointment of a Chapter 11 trustee. And in this case, there was indications that there would be a Chapter 11 trustee, and that alone would prevent immediate reconversion. Secondly, under Section 1112b2, the bankruptcy court could not convert the case from 11 to 7 if there were a determination that that was not in the best interest of the creditor and the estate. So that would be another legal step necessary before there could be reconversion. So when Murama talks about an immediate risk of reconversion, that could not happen here either legally or factually. And the court missed that entirely. So there couldn't be no follow-up discovery or anything? It would have to be immediate? That's what Murama says, an immediate reconversion to the point where it's just futile to convert from a 7 to 11 or in that case from a 7 to a 13 because it would be coming right back. And that would not be the case here. We had a viable, detailed disclosure statement, a detailed plan of reorganization. As I mentioned, we had the chief restructuring officer, and we had a restructuring support agreement as well as debtor possession financing. And that was an opposed motion by creditors, is that correct? No, actually all the secured creditors signed off on the restructuring support agreement. A significant number of unsecured creditors signed off on it. To the extent it was opposed, it was opposed by JIG, Jackson and Aris, two allegedly unsecured creditors. We say allegedly because we believe they're notes that actually converted to equity. But that was the only opposition in addition to the trustee. The other thing I'd point out is that the conversion would, and this was really undisputed, would benefit the creditors and the estate. All causes of action, importantly, against all potential wrongdoers would be asserted in contrast to the JIG agreement that my colleague will be talking about in a moment. The chief restructuring officer would superintend the process, and creditors, importantly, would get to vote. That was the most important factor that the court entirely overlooked, the right of creditors to vote on a potential plan of reorganization. The court talked about bad faith. There's no basis for that at all. In fact, the court declined to find any pre-petition bad faith, cited no evidence of any post-petition bad faith, certainly not in the context of what we see in the cases, which involves concealing assets or nondisclosure of assets in a way that harms creditors. There was nothing here whatsoever that was meant to or did harm creditors. Murama talks about denial of conversion being reserved for atypical and extraordinary cases. This is neither one. This is not an atypical or extraordinary case. The only thing extraordinary about it, I think, is the detailed plan, disclosure statement, and chief restructuring officer that we offer to the court. Likewise, there was no abusive process. The court went completely astray on that one by again circumventing Siegel, which says a bankruptcy court cannot use equitable powers under Section 105 to circumvent rights given to creditors, debtors in this case, the right to convert. The court said that filing the motion was an abusive process. Well, it can never be an abusive process to file motion that the code specifically permits a debtor to file. The court talked about there being some, trying to exact a litigation advantage. Well, every motion is intended to exact a litigation advantage. That's why lawyers file them. And indeed, I would submit that the trustee in Jackson's JIG sought their own litigation advantage when they filed their motion. And finally, if the court's concern was that the plan was somehow meant to cut off the adversary proceeding that had been filed, that was not going to happen, at least not until the plan was proposed and confirmed, because only then would the adversary proceeding be cut off. Is there any dispute in this case of the standard of review on 706A? I think it's an open question, Your Honor, in this circuit what the standard of review is. The Daughtry case from the 11th Circuit talks about abuse of discretion. Here I would submit that what happened is the court overestimated its own discretion and underestimated the debtor's discretion, which exists under Section 706. When Siegel says that, see I'm over my hat, says a debtor may do something, that gives the discretion to the debtor, not to the court. Thank you, Counsel. May it please the Court. Good morning. Ryan Downton for WIPI Collateral Management LLC, the collateral agent for more than two dozen secured creditors in the bankruptcy of With a Sink. Here over the collateral agent's objection, the bankruptcy court approved an agreement with the Jackson Investment Group in violation of the secured rights of the collateral agent. Essentially, the judge reached an outcome-based determination where she decided what claims she wanted prosecuted and that she tried to backfill that with law and factual findings. The Jackson Investment Group has five characteristics, any one of which make it invalid and all of which the bankruptcy court overlooked. First, the agreement is not a sale or a settlement. It's characterized as both, but there were no sales of any causes of action. The trustee says that. The court says that. There is a purported sale of control over causes of action. Well, we don't think that's possible. It's not a settlement. There was no dispute between the Jackson Investment Group and the trustee. Second, it delegates to a conflicted party the trustee's fiduciary duty to decide what claims to bring and what claims not to bring. Third, it effectuates a subversive plan by purporting to sell control over causes of action where the collateral agent has a security interest without satisfying that security interest. Fourth, it allowed Jackson Investment Group's $10 million unsecured claim without considering the collateral agent's objection to that claim. And finally, it involved a de facto release of estate claims against Jackson Investment Group and other alleged wrongdoers because of the failure to award derivative standing to the collateral agent for the claims that Jackson Investment Group was choosing not to pursue, exercising the trustee's fiduciary duty. So what was the agreement between the Jackson Investment Group and the estate? Well, there was no sale of estate causes of action. There was a sale of certain assets. There was $100,000 paid for the name Glorify and subsidiaries. But that stands off to the side. No one's challenged that. And then there was $6 million paid for, quote-unquote, control and the soul of the case. Well, the trustee and Jackson Investment Group structured this transaction in a way to avoid the requirements of Section 363. They didn't propose approval under 363. This was proposed as a settlement. And so they cannot now, they're stopped from claiming the benefits of the appeal halting power of 363M because they did not comply with any other provision of 363 to satisfy the collateral agent's security interest. And as far as the settlement itself, the dispute at issue at the time was between the collateral agent and the trustee. Jackson Investment Group was not in dispute with the trustee. They were aligned. The purported settlement only released third-party claims. Second, the trustee cannot sell discretion over which claims to bring. Under Texas law, this discretionary power is a core fiduciary duty. It's neither transferable nor delegable. So why didn't the court just, well, why didn't the trustee come and say he wanted to just sell the claims to Jackson Investment Group? It's undisputed, a trustee could sell claims. But here, some of the claims being sold were subject to the collateral agent's secured debt. And they could not be sold free and clear under a typical 363 sale without addressing that debt or allowing a credit bid. And here, the collateral agent made a credit bid of $20 million. That was ignored by the court. So the court tried to craft a way, or the trustee and Jackson tried to craft a way around 363 by calling it a settlement and a sale of control when the corpus of the claims could not be sold given the factual circumstance here. Third, the sub rosa plan. I mean, the terminology here really doesn't matter. A sub rosa plan is when you have a transaction that seeks to alter the party's rights without their consent. And it's an end round, end run around the protections granted to creditors under the bankruptcy code. And that's what's happened here by disregarding the secured claims of the collateral agent. Fourth, and this is pretty clear under Fifth Circuit law, the official committee of unsecured creditors versus Moller, the In Re AGE refining court case, 801F3530 from 2015, held that the bankruptcy court erred in denying an unsecured creditor's committee objection to a secured creditor's claim and approving a settlement agreement without making a claim, a determination on the validity of the claim. Here, it's undisputed. There was an objection by the collateral agent to Jackson Investments' $10 million claim. There was no hearing. There was no discovery. And indeed, the whole matter was stayed. That's from page 26761 of the appeal. The trustee did not even respond to briefing on this issue. In the 2015 case, it was held harmless error because a hearing had been held and everything had been done on the claim other than a final determination. Here, none of that happened. And there was no dispute between the trustee and Jackson over the claim. The trustee supported Jackson's position. It's outside the record in this case, but the later approval by the bankruptcy court or the overruling of objections to the collateral agent's claim necessarily means that the court would have had to reject Jackson's claim. And the trustee, sorry, the collateral agent was entitled to that determination prior to approval of the settlement that included a $10 million unsecured claim that dilutes the collateral agent's priority. And finally, the issue of derivative standing. Again, the trustee did not respond to briefing on this issue at all. The bankruptcy court should have, at a minimum, even if it approved the Jackson agreement, granted the collateral agent derivative standing to pursue the claims against the so-called DAGA defendants, the Jackson Investment Group and its allies, where the trustee was either unable or unwilling to bring those claims due to the agreement with the Jackson Investment Group. The agreement with the Jackson Investment Group explicitly disclaimed any releases, but it created a conflict of interest. Jackson's not going to sue himself, therefore the trustee cannot sue Jackson. Jackson's not going to sue his allies, therefore the trustee cannot sue his allies. At that point, the trustee is unable to bring those claims. And at that point, derivative standing applies. Collateral agent petitioned the trustee to bring the claims. The trustee refused. The claims are colorable. The trustee told the bankruptcy court there are colorable claims against all parties. In this case, both the people on Jackson's side and Mr. Nagabower. And the creditor, in this case collateral agent, sought permission from the court to bring those claims. I see I'm out of time, so thank you. Thank you, counsel. May I proceed, Your Honors? Good morning. May it please the court. I don't want to be mistaken for... I apologize, Your Honor. I'm General Counsel for Scott Seidel, the trustee who is present in the courtroom as well. I will not pretend that I can improve on Judge Larson's 68-page opinion. Any questions that the court has, she has answered in a thoughtful, emphatical, and I think very compelling and persuasive manner. She did so after seven days of trial, 12 witnesses, hundreds of exhibits. We don't have those frequently in bankruptcy. We don't have those frequently on a motion to convert or a motion to approve compromise. It's because what the parties did, largely at the appellant's request, was to hold a mini-trial on these exotic grand conspiracy theories that some of the most influential, wealthiest people in this country, Peter Thiel, Vivek Ramaswamy, Rick Jackson, the president of Citadel Investment, conspired to take away Mr. Nugget Bower's baby, the anti-woke bank called Glorify. There are colorful people in this case. There are colorful allegations. I'm going to tell you that it boils down to a very boring aspect of bankruptcy law. But the fact that we had two warring narratives that the bankruptcy court found are mutually exclusive, the fact that we have billionaires, people that can defend themselves, people that can prosecute claims, people that are highly sophisticated. The fact that we came in not knowing which side was telling the truth, although we knew it was that someone was responsible for the demise of a $1.6 billion company. And then, mindful of the fact that we had no money with which to sue all these billionaires, the trustee made a reasoned, informed business decision to put the causes of action up for auction. Counsel, let me ask you. It certainly is not particularly colorful, maybe it's even mundane, but there is a significant statutory argument that what was sold here, the right to control litigation, may not have been an asset of the state. A state sort of explored what supports this particular sale as actually being legitimate when you then take out the oversight that you usually have over litigation and turn it over to a creditor. Your Honor, I'm going to explain why we came to have this unorthodox route. Why? I'm wondering about if. There is oversight, Your Honor. There is oversight. Well, there's oversight and there's supposed to be consultation, but there's no veto, there's no right to control. Your Honor, there is a standard of gross negligence. The bankruptcy court reserved for herself full jurisdiction to decide if there's gross negligence. There is consultation, this is correct. And ultimately, this comes down to, as I'll argue when I talk about that sale order, ultimately it comes down to what is otherwise equally analogous to a sale or a financing transaction. The buyer or the lender decides which cause of action are meritorious and which to prosecute. What Your Honor is suggesting, Your Honor is discussing their delegation of authority and fiduciary duty argument. I would say that in a sale, if these claims were sold outright, well, there'd be no argument that the trustee delegated his authority. He sold that control. Or, again, if we have a financing transaction like with litigation funders, which we have sometimes, again, there'd be no argument of a delegation. The lender would make an informed business decision as to which cause of action were meritorious or not. So, again, this is an unorthodox result, but it's important to remember why. The trustee tried to auction these claims. Motion number one, objected to by them, saying that they have liens in these causes of action, which, outside of this record, but the court will hear in due course, the bankruptcy court after a subsequent week-long trial rejected, finding that they have no liens in commercial forklifts. What's your position of the deal that Mr. Siddall made with JIG? Was it a sale under Section 363, or was it a compromise under Rule 9019? Your Honor, I believe that it's both, and perhaps what it really is, is under Section 363B, the use of estate property. Section 363B says that the trustee, with the court's permission, may use, lease, or sell estate property. The court may not agree that this is an outright sale, as I've argued in my motion to dismiss, but I don't think it can be disagreed that this was a use of property. Now, it's important to go back to Section 541A1, which defines what is property of the estate. This is what this court in Henry Moore and in South Coast Properties looked at. Section 541A doesn't define property of the estate as an asset or as pre-petition property. It defines property of the estate as all legal and equitable interests. So if we look at it, the atoms, the foundation blocks of what it means to have an asset, each one of those is a congressionally defined interest that this court has said may be sold or may be used or may be pledged. In a Chapter 7 case, the trustee's job is to monetize all property of the estate. That's what he did here. And because of the unique factual position of this that I'm going to get back to, because they blocked us illegally, mind you, and they've been sanctioned a million dollars. Let's not forget that. Because they blocked us illegally in attempting to do it the orthodox way, the sale, the lien. And with limitations looming, that's why this was done, for limitations purposes, because Section 108 extends limitations for a trustee but not for others. In taking their form of contract, Your Honors will recall from the facts that we first had a deal with them when they held a gun to our head, having blocked our auction, having sued our defendants in Delaware and Georgia, having left us with no money, having filed a settlement and said, make it your problem now. And after a year and a half of litigation, we had a deal with them that was identical to this. The same thing, they would have control. They would decide who to sue. Well, Mr. Jackson, running for governor of Georgia right now, decided to top them. It's Chapter 7, it's bankruptcy. Buyers top other buyers. There's auctions. He topped them. He brought in $6.1 million. The bankruptcy court gave them a chance to top that, and they didn't. Instead, they filed a motion to confer. A year and a half later, Your Honor, a year and a half later, and Your Honor's question is answered by Judge Larson on page 32 of her opinion. They did not have the money to fund the Chapter 11 plan. I asked the man. He said, we don't have the money. We don't have $2 million. They did not have the money. So, again, so we arise through a very unique fact pattern to a very unique resolution. And it is unorthodox, but, again, it's unorthodox because we tried it every other way. Counsel, you haven't touched on this yet, and maybe I'm getting a little ahead of you, but I'm not quite sure I understand the 363M argument regarding mootness. Can we affirm in this case if we agree with you and the bankruptcy court? Are we able to affirm without doing so under 363M? I believe so, yes, Your Honor. So that's an argument in the alternative? Is that a good way to look at it? Yes, Your Honor. 363M requires that this be construed as a sale. As sale, right. And I acknowledge that this is not a crystal clear proposition that it's a sale. I acknowledge that. The bankruptcy court said that this is not a clean and neat fits into a box sale. Notwithstanding that the bankruptcy court did find that this is a sale under 363B, F, and M. But if this is a use of estate property, which I, again, don't think that anyone can credibly deny that it's a use of estate property, 363M would not apply. Okay. I hope I've answered Your Honor's question. Yes. Go ahead. There was a motion for this court to stay. The motions panel denied it of this court. What was the status of the sale or the use of the whatever when that motion was filed? If stay had been entered, would that have stopped any of the effectiveness of the agreement? Yes, Your Honor, it would have. It was early enough? Okay. We had an evidentiary hearing in front of Judge Larson on the motion to stay. Judge Larson said to them, call your first witness, submit your first piece of exhibit. They had none. She said, really? They had none. So she denied it because one of the elements for a stay is a showing of some prejudice. Then we had a hearing in front of Judge Scholar of the district court where, again, they sought a stay, and that was denied. In the meantime, they sought a mandamus from this court wanting to have the trustee be forced by this court to sue these grand conspiracy billionaires, which this court, of course, denied. But, again, their remedy all along in Chapter 7 money talks, their remedy all along was to put up more money, either to get the assets or put up money in a supersedious bond to protect the innocent creditors. And I want to go back, Your Honors, to the conversion motion because it does – there has to be some level of intellectual honesty. This motion of theirs did not enjoy massive creditor support. On page 28 through 30, Judge Larson goes through how, in fact, most creditors didn't know about it. The creditors that did support it were insiders of Mr. Nugent. Other creditors were never given it. Other people that supported it, the RSA that Mr. Levenger talked about, were equity holders. But the key fact here is that when they filed their motion to convert, they did not serve it on the creditors. Judge Larson, as a result – and this was a difficult part of the hearing. Judge Larson was very upset. How can you come here to me seeking to convert this case with all these hundreds of millions of dollars of creditors and not have served them? And, ultimately, she struck a compromise. She said, I will let you proceed, but I will forbid evidence of creditor support, and I will forbid argument. She answered, basically, I'm eliminating. That was not appealed. So no one could talk about the funds available? The funds available were different, Your Honor, from whether what they wanted to do enjoyed massive creditor support. So they were forbidden from discussing the alleged massive creditor support because I don't know what word to use. It was a charade. How do you have massive creditor support when you don't even serve your papers on the creditors? And, again, Judge Larson finds on page 28 through 30 that the creditors allegedly that did support this were purely insiders of Mr. Nugentauer. I say that only to mean, again, that as this Court deliberates, it should remember that Judge Larson forbade evidence or discussion of that. They have not appealed it. And she did it with good cause because they're the ones that messed up. Going back to conversion, my argument on conversion is very simple. In addition to the Supreme Court's case of Marama, they filed a motion. They filed a motion in front of a federal court. That federal court is not powerless to prevent itself from being used to further an abuse process. Now, Section 706A says the debtor may convert a case. It does not say the court shall convert the case. There are multiple instances where Congress has said the court shall do something. The court shall grant a discharge. The court shall confirm a plan. The court shall dismiss a case. This is not one of those. It says the debtor may convert a case. Well, how does a debtor do that? A debtor doesn't just come to court and proclaim itself now in Chapter 11. It files a motion. Under Bankruptcy Rules 9013 and 9014, it files a motion. Well, that triggers the whole judicial adjudicatory process, and federal courts are not powerless to protect themselves from having themselves used to further an abusive process. In different analogies, this court has multiple times affirmed so-called pre-filing injunctions for vexatious litigants. But they're not a vexatious litigant. But the court looked at it, and the court said, okay, you're coming to me for relief. This is a court of equity. Bankruptcy is all of it is discretionary. This is not like a legal right, like in Law v. Siegel, a property right, an exemption. This is not a constitutional right where whether the person is a bad person or not, he has his rights. This is not a contract right where, again, whether you're a good person or a bad person as a plaintiff, you still have your rights. This is a discretionary relief that you're asking me to grant. And as a court of equity, I'm allowed to look at your motivations. I'm allowed to look at whether your hands are clean or not. I get to look at how you have manipulated the process for the last year and a half. The bankruptcy court found Mr. Nuggebauer was the man behind the curtain. One day, he's the collateral agent. One day, he's the debtor. One day, he's a secure creditor. Each time, arguing contradictory to his prior arguments in order to delay and frustrate the process. Why? He's the one that filed a Chapter 7 voluntarily, handed the keys to my client. Didn't hand him money. There was a little bit, very little, by the time that this manifested, the money was gone. And said, do with it as you will. Well, a year and a half later, when that no longer suited him, when he lost in front of Judge Larson, that's when this conversion matter arose. And after, they filed the illegal complaints in Delaware and Georgia. Asserting for themselves property of the estate, the way of the estate cause of action. Was the bankruptcy court really going to have to ignore that? And then in a Chapter 11, no business, no employees, nothing to restructure. The only assets were the same assets as in Chapter 7. These exotic causes of action against some of this nation's wealthiest, most influential people. It was, like the judge said, a battle for the soul of the case. Who's going to control these causes of action? Chapter 11 doesn't exist for that. Chapter 11 doesn't exist to help people with gamesmanship and try to out-strategy each other. It exists to rehabilitate and restructure debt. If this court finds that the bankruptcy court had no ability to take that into account, then it's necessarily concluding that a federal court does not have any say that it must grant relief, no matter how inequitable the relief and no matter how inequitable the actions of the party seeking that relief. But I also urge the court to look at the results. After a year and a half of litigation, almost two years really, after them having sued in Delaware and Georgia, and I sued them for debtoratory relief, and we had failed sale and failed auction, and recall, this is a fact. Mr. Nuggebauer's lifelong friend, the collateral agent, testified that they filed those claims in Delaware and Georgia to block and frustrate the trustee's sale. That's a fact. They intentionally violated federal law because they wanted to block that sale. So after all of that litigation, what are the results today? More than $16 million for the creditors of this estate. The court might have some concern about an alleged abdication of duty. It might. I would suggest that it not look at that in a vacuum. We are now sufficiently ahead of time, a year and a half later, to where all this has been working as it should. We've already recovered $16 million, 6.1 of which was guaranteed free and clear no matter what. The rest is litigation recoveries. And we still have our claims against Mr. Nuggebauer and other people. So, yes, again, this was an unorthodox structure. Where is the control or the supervision or whatever you want to call it that the bankruptcy judge maintained? Has that been exercised? Has any of these sales or other actions by those with the rights to control the litigation been brought before the bankruptcy judge in saying the creditor's rights are being ignored or some other argument? No, Your Honor. It has been a smooth process. Therefore, no party has felt the need to get the bankruptcy judge involved. There has been one motion to approve a sale in excess of $5 million. I'm sorry, not a sale. One motion to approve a compromise with an estate defendant for more than $5 million that was filed and that was approved. So, Judge Southwick, the process has been working smoothly so far. We have not had to bring in the bankruptcy court to supervise any kind of dispute or concern about that. Again, going back to Law v. Siegel, I think this is the key distinction here for purposes of their argument that Marama is somehow no longer any good law, even though multiple courts, including the 11th Circuit, as I've cited in my brief, have re-ratified Marama after Law v. Siegel. Law v. Siegel concerned a property right, an inviolate property right that the bankruptcy court took away from someone because they had engaged in bad acts. That is fundamentally different. And I think we can all agree that that is something fundamentally of more concern than not granting someone discretionary relief that they have no right to because of their own bad acts. So I don't think, and it bears reminding that Law v. Siegel was authored by Justice Scalia, who dissented in Marama, yet he, in Law v. Siegel discussing Marama, had every chance to say it's no longer law. It was dicta, it was plurient. He didn't. He differentiated Marama. And I believe basically held that it's still good law, notwithstanding Law v. Siegel. But even so, all we have to look at is the fact that a federal judge has to have the ability to protect her integrity and that of her process. And this judge made extensive findings of fact, which cannot be set aside for clear error, that they engaged in bad faith, that they abused the process, and that even their own motion sought relief in bad faith. You're saying you haven't involved the bankrupted judge with these proceedings, these attempts to compromise or whatever. Should the case be remanded to determine JIG's proof of claim? Is that still pending? Your Honor, that claim has been allowed at $10 million. And again, it was allowed after seven days of trial and 12 witnesses. What they argue about is not the estate's compromise of that claim, but that the estate compromising that claim effectively resjudicated or precluded their separate claim objection. So I think this is a nuance that I think should be considered. The claim was filed against the estate. Proofs of claim can be objected to by other creditors. So they filed an objection. But ultimately, the claim is still against the estate, not against them. And the trustee is the representative of the estate. So the trustee enters into a compromise of a contested proof of claim. That compromise is binding on the estate and binding on all other creditors. And so it has to be. You can't have in a collective proceeding 50 claim objections. There has to be a sheriff, and that's the trustee, and there has to be a centralized forum. That's the bankruptcy court. And the allowance of that claim by way of compromise necessarily, yes, got rid of their separate claim objection, but that is not something that this court can remedy or redress. It is just a fact of litigation and a fact of the congressional scheme about the allowance of claims. So there's nothing to remand? Not with that, Your Honor, I don't believe anything with that. What would be remanded is for the bankruptcy court to consider their claim objection. I take it that's the court's question. And the bankruptcy court would say, well, I've already allowed that claim because the trustee has the right to settle that claim, and after a seven-day trial, I found that that settlement was fair and appropriate. And it necessarily, I guess the word is extinguishes. It necessarily extinguishes whatever standing they had or whatever ability they had to contest the claim because the judges allowed it. Okay. Let me conclude, Your Honors, by just pointing out again, as I've acknowledged, that this result is unorthodox. The court should have no concern that this result is somehow going to be setting forth a mold for future cases. The facts of this case are extremely rare given the claims involved, the wealth of the people involved, the years of litigation involved. And at the end of the day, what the trustee did, the trustee has a fiduciary duty to maximize the value of the estate. At the end of the day, that's what he did. He's brought in $16 million to the estate. He's bringing in more. And the court should have no concern that what happened here is somehow not supported by the individual building blocks of the bankruptcy code. Those include transparency. Everything was done in public. Those include consulting creditors. Yes, we had creditors supporting us, and we had creditors not supporting us. Those include a centralized forum to adjudicate disputes. We had a trial. Those include rules of procedure, due process, rules of evidence. We had all that. Those building blocks include monetizing estate claims. If you think of one bookend here, it's a sale. We can outright sell those claims. Everyone agrees with that. This court says so, and then read more. And the other block here is we could pledge those same claims without selling them, but pledge them as collateral to get litigation funding in. Those two are clearly and certainly appropriate. Then how can something in between those two not be appropriate? So we use the building blocks that the bankruptcy court gives us to build maybe a little bit of a different result than the court is used to seeing, but it is still a good, transparent, equitable result that benefits the creditors. The only one who loses is Mr. Nugent. But he's the one who filed this case and made it the trustee's problem in the beginning anyway. Your Honors, unless you have any questions, thank you for your time. Thank you, Counsel. We'll hear a rebuttal. Counsel has tried to add two requirements to a conversion that don't exist under the statute. One is he says that there has to be a company to reorganize. Well, that's not true. The U.S. Supreme Court in the Toit case said that reorganization is not a prerequisite to a Chapter 11. In fact, the trustee admitted in his case at page 26696 that he has seen and has been involved in Chapter 11s that have a liquidation or litigating trust that assert cost of action, just like what we would have had here. Secondly, it's not a requirement for a conversion to Chapter 11 that there be creditor support. But there was creditor support here. The evidence showed, undisputedly, that every unsecured creditor signed off on the restructuring support agreement and a significant number of unsecured creditors did. The only opposition came from Jackson and Ayers. Do you have a response to the factual statements the opponent was making about that issue, that the bankruptcy court wouldn't take evidence on the support from creditors? Ultimately, the court did take evidence of it, despite that statement, and the restructuring support agreement did come into evidence without any objection, and it on its face showed unanimous support from the secured creditors and a significant number of unsecured creditors who supported it. I think cutting through it all, I think what we have here is a situation where the court decided what it wanted to do and then worked backwards, disregarding the protections given to both secured creditors and debtors. Segal makes very clear, and it said so, that Murama most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code. Counsel said that bankruptcy courts act in equity. No, they don't. They're creatures of statute. And this court has said multiple times that bankruptcy courts are not roving commissions to do equity. And that's what this court tried to do. It trampled the rights of both debtors, both the debtor and the unsecured creditor, the secured creditors, in a way that overrode the determination of the debtor, in particular, that it was in the best interest of the creditors and the estate to have a plan in which there would be a vote by the creditors as to whether it's proper to assert all costs of action. Judge Clement had asked some questions of your opponent regarding the JIG claim. Do you agree with his answers to those questions about the allowance of the claim, that the court had already ruled on that and there would be no need to remand it, as I understood his answer? Well, that's a Mr. Downton issue because that deals with the Jackson Agreement. But my response is I don't agree because there was no determination by the court. The court simply approved the agreement that allowed the claim in violation of the Moeller case in Section 502. So, no, I don't agree with that statement at all. Okay. Well, maybe the next counsel will tackle it. Yes. Thank you.  Well, Your Honor, I'll start there. So, no, I don't agree. The claim was not approved pursuant to a hearing. It was not approved after discovery. It was only approved in the context of approval of this settlement or whatever you call the agreement with Jackson. And that's clear error under Moeller. Plain and simple, must be reversed on that ground. When standing alone, Mr. Jackson testified that the allowance of the claim was integral to the agreement and the trustee never got an opportunity to have its objection heard and ruled on. Judge Southwick, you asked about oversight. Let me, Southwick, get into there. If 363M doesn't apply and we don't want to be relevant if we do essentially uphold the earlier decisions by the bankruptcy court, what would requiring the bankruptcy court to do on considering the validity of the claim, how would that affect what's happened since this case was appealed? Doesn't an awful lot have to be unraveled, which is the purpose for 363M, which your opponent says may not be applicable? Thankfully, no. So what's happened since this appeal started? There have been a number of settlements. All of those settlements stay in place. There's been 16M that's come into the estate. All of that money stays in the estate. None of that changes. The only thing that changes is who's in charge going forward. Is the trustee in charge or is the trustee able to give all of its oversight to Jackson Investment Group? You asked about the oversight earlier, and the agreement says Jackson Investment Group has, quote, sole authority to prosecute or not prosecute. The trustee has no current oversight. There was an answer from opposing counsel of one of you, at least, that the bankruptcy court does continue to have a role, and at least some level, there's a standard that the bankruptcy court can apply to the legitimacy of the actions. The standard is the trustee can object if he finds gross negligence on the part of Jackson. And what does negligence mean in this context? Well, it's not just negligence. It's gross negligence. I don't understand, but what does negligence mean in this context? I think that's very hard to understand. I mean, it's a question of is Jackson deciding not to sue himself if there's a cause to do that gross negligence? Is Jackson deciding not to sue another third party? He may have business relationships, gross negligence. It's a very almost impossible standard. Okay, get back to what you were pointing to say. I got your answer. Mr. Rukavina said the only one that loses with the disagreement being approved by the court is Mr. Nagebauer. Respectfully, I disagree. I'm here for approximately 24 secured creditors who have lost their rights. When the bankruptcy court declined to provide derivative standing to the collateral agent, it has essentially extinguished all of the claims the collateral agent wished to pursue on the estate's behalf against Mr. Jackson and his allies. And the bankruptcy court abused his discretion in failing to do so. We'd ask you to reverse and remand. As we said, the settlements don't need to be undone. Within the court should mandate derivative standing for the collateral agent for all of the claims the trustee and Mr. Jackson, assuming they enter into another agreement, decide not to bring. The court needs to consider Mr. Jackson's claim, the $10 million unsecured crane, on its own. The current litigation against Mr. Nagebauer and anything else that's been filed in the trustee's name continues. The only question is, does the trustee continue to control it? Or does he reach a new agreement with Mr. Jackson to control it? Or if you convert the case, does the new trustee control it? All right, Counselor. Thank you. Thanks to all of you for bringing this case to us, and we'll take it under advisement.